NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-1636                                          Appeals Court

COMMONWEALTH  vs.  TAKII RASPBERRY.


No. 16-P-1636.

Suffolk.     April 12, 2018. - July 27, 2018.

Present:  Rubin, Sacks, & Singh, JJ.


Cellular Telephone.  Practice, Criminal, Motion to
     suppress.  Search and Seizure, Emergency, Motor vehicle,
     Probable cause.  Probable Cause.  Constitutional Law,
     Search and seizure, Probable cause.


     Complaint received and sworn to in the Roxbury Division of
the Boston Municipal Court Department on April 15, 2015.

     Following transfer to the Central Division, pretrial
motions to suppress evidence were heard by Catherine K. Byrne,
J.

     An application for leave to prosecute an interlocutory
appeal was allowed by Kimberly S. Budd, J., in the Supreme
Judicial Court for the county of Suffolk, and the appeal was
reported by her to the Appeals Court.


     Timothy St. Lawrence for the defendant.
     Cailin M. Campbell, Assistant District Attorney, for the
Commonwealth.

SACKS, J.  Before us is the defendant's interlocutory appeal[1] from the denial of her motions to suppress evidence obtained by police through (1) warrantless real-time tracking of the defendant's whereabouts using cell site location information (CSLI) and (2) a warrantless search of her motor vehicle, leading to the discovery of a loaded firearm and a stun gun.[2]  We affirm.

Background.  We recite the relevant facts as found by the motion judge, supplemented where necessary by uncontroverted police testimony, which the judge expressly credited in full. See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008).  None of the judge's subsidiary findings is challenged on appeal.

In April, 2015, as part of a joint investigation with Federal authorities, the Boston police were conducting a wiretap of the telephone line of one Mike Coke pursuant to a Federal

---

[1] A single justice of the Supreme Judicial Court allowed the defendant's motion to pursue an interlocutory appeal and ordered it to be heard in this court.

[2] The defendant is charged with unlicensed operation of a motor vehicle, G. L. c. 90, § 10; carrying a firearm without a license, G. L. c. 269, § 10(a); carrying a dangerous weapon (a stun gun), G. L. c. 260, § 10(b); carrying a loaded firearm without a license, G. L. c. 269, § 10(n); and possessing ammunition without a firearm identification card, G. L. c. 269, § 10(h)(1).  As to the stun gun charge, see Ramirez v. Commonwealth, 479 Mass. 331 (2018) (absolute prohibition of civilian possession of stun guns in G. L. c. 140, § 131J, is unconstitutional).

court order.[3]  At approximately 4:30 P.M on April 14, 2015, an officer in the "wire room" was monitoring a call from Coke to an unidentified woman, and he heard her say:  "I'm about to go shoot up this nigga right now, I'm going to get the fucking gun, I'm sick of this bitch ass nigga yo.  He fucking took my fucking money and don't want to give it the fuck back.  I'm going to his, I'm going right there, right now.  Right fucking now, by my fucking self . . . ."  The judge, who listened to a recording of the call, found that she sounded "angry, upset, and emotional." The wire room officer found the call "alarming" in that the woman on the call "intended to use a firearm to shoot someone." He checked her telephone number in various databases and identified her as the defendant.

The police then knew that the defendant was referring to Alvin Dorsey, with whom she had been in "some type of romantic relationship."  The judge found that "the police were reasonable in having grave concerns about the defendant imminently causing serious bodily harm."

Within fifteen minutes of hearing the defendant's threat, the officer called AT&T to initiate an "exigent request."  He stated that the Boston police had reliable information that a person using an AT&T cellular telephone (cell phone) might have

---

[3] The defendant has not challenged any aspect of the wiretap.

a gun and might be about to harm another person. He provided the defendant's cell phone number and asked AT&T to perform "emergency pings" and give the police real-time CSLI about the approximate location of the defendant's cell phone.[4] AT&T agreed to assist, and it began sending the results of the pings to a designated Boston police electronic mail (e-mail) address at approximately fifteen-minute intervals. The officer mapped the location of each ping result as it was received and shared this information with officers in the field attempting to find the defendant.

The first result, received at 5:06 P.M., showed the cell phone within a 1,880 meter radius of a cell site in Braintree. Subsequent results showed the cell phone to be moving toward Boston, leading police to believe that the defendant was on her way to locate Dorsey. Specifically, a 5:37 P.M. result showed the cell phone somewhere in the Dorchester section of Boston, and a 5:53 P.M. result showed the cell phone in the Roxbury section of Boston, within a 652-meter radius of a cell site atop a food market. In the meantime, police had learned that Dorsey "may have been" with a girl friend who lived at a particular address in a housing project near that market. Results received

---

[4] See Commonwealth v. Fredericq, 93 Mass. App. Ct. 19, 27-28 (2018) (describing real-time CSLI). See also Commonwealth v. Long, 476 Mass. 526, 530 n.3 (2017) (describing historical CSLI).

at 6:25 P.M. and 6:41 P.M. showed the cell phone in an area with a 487-meter radius that included that housing project.

At 6:46 P.M., the officer in the wire room, still monitoring Coke's phone calls, listened to a second conversation between Coke and the defendant.  In this call, the defendant said, "I'm sitting right in front of her house," which the police knew referred to the house of Dorsey's girl friend.  The defendant further stated that she was going to "shoot him and his bitch in the face"; that she knew Dorsey was in the apartment because he had been texting her; that she was waiting for him; that if he did not come out, she would be back at 7:00 A.M. in a motor vehicle that he would not recognize; and that she would jump out and "pistol whip" him.  She added that if Dorsey sent anyone to attack her, it would be a "firefight," which the detective understood to mean a "shootout."

At this time, a Boston police sergeant, who had been kept informed of the defendant's threats and suspected location, was in a motor vehicle near the market and the housing project.  At approximately 6:50 P.M., the sergeant turned onto the street where Dorsey's girl friend lived and observed a woman sitting in a motor vehicle parked about 100 yards away from, and with a clear line of sight to, the girl friend's residence.  The woman was talking on a cell phone.  The sergeant knew that the defendant was on the phone with Coke at the time.

The sergeant called in the motor vehicle's license plate number and learned that the vehicle was registered to the defendant. The sergeant then contacted a Boston police detective who, along with two other officers, was patrolling the area in an unmarked cruiser. The sergeant described the defendant, her vehicle, and its plate number and location; warned the detective that the defendant likely had a firearm and was threatening to shoot someone; and asked the detective to stop the defendant's vehicle.

The three officers stopped and approached the defendant's motor vehicle on foot. The detective then asked her for her license and registration. When she said she did not have a license, she was ordered out of the vehicle and arrested for operating without a license. One officer led her to the rear of the vehicle, while the others searched the vehicle. They found a stun gun in the defendant's purse in the passenger compartment and a loaded gun in the trunk.

The defendant filed separate motions to suppress the fruits of (1) the warrantless CSLI search of her location and (2) the warrantless search of her motor vehicle. The judge ruled that the CSLI search was justified under the emergency aid exception to the warrant requirement, because the police had a "good faith, reasonable belief that there was a serious and imminent threat to human life." The judge further ruled that the search

of the vehicle was justified under the automobile exception, where the police had probable cause to believe that the vehicle contained a loaded firearm that the defendant intended to use.

Discussion.  In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings unless clearly erroneous, see Commonwealth v. White, 374 Mass. 132, 137 (1977), aff'd, 439 U.S. 280 (1978), and make an "independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found.'"  Commonwealth v. Haas, 373 Mass. 545, 550 (1977), quoting from Brewer v. Williams, 430 U.S. 387, 403 (1977).

1.  CSLI search.  The parties and the judge proceeded on the assumption that the police use of the CSLI voluntarily provided by AT&T, in order to track the defendant's location in real time for two hours, was a search, subject to the warrant requirement of art. 14 of the Massachusetts Declaration of Rights.[5]  Compare Commonwealth v. Augustine, 467 Mass. 230, 255 (2014), S.C., 472 Mass. 448 (2015) ("[T]he government-compelled production of the defendant's [historical] CSLI records

---

[5] After this case was argued, the United States Supreme Court decided that "accessing seven days of [historical] CSLI constitutes a . . . search" under the Fourth Amendment to the United States Constitution but declined to determine whether accessing such CSLI for a more limited period might not be a search.  Carpenter v. United States, 138 S. Ct. 2206, 2217 n.3 (2018).

[covering two weeks] by Sprint constituted a search in the constitutional sense to which the warrant requirement of art. 14 applied"); Commonwealth v. Fredericq, 93 Mass. App. Ct. 19, 27-28 (2018) (government-compelled creation and production of real-time CSLI for more than six days was subject to art. 14 warrant requirement).  Without deciding the question, we proceed on the same assumption.[6]  And, as neither the Supreme Judicial Court nor this court has previously determined whether an emergency might justify a warrantless CSLI search, we begin by reviewing emergency search cases from other contexts.

a.  The emergency aid exception.  In the context of a search of a home, where constitutional protection against unreasonable searches is at its zenith,[7] the courts have recognized an "emergency aid" exception to the warrant and

---

[6] The judge made two additional rulings, neither of which the defendant challenges on appeal, and on which we therefore express no opinion:  (1) that AT&T's provision of the CSLI was authorized by language in the Federal Stored Communications Act, 18 U.S.C. § 2702(c)(4) (2012), addressing "an emergency involving danger of death or serious physical injury"; and (2) that, because of the emergency circumstances, the police did not violate G. L. c. 271, § 17B, as amended by St. 2008, c. 205, § 3, in obtaining the CSLI without an administrative subpoena. See Commonwealth v. Chamberlin, 473 Mass. 653, 663 (2016) (reserving question whether § 17B, as amended, "precludes the government from asking a service provider to turn over customer records voluntarily").

[7] See Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018); Selectmen of Framingham v. Municipal Ct. of Boston, 373 Mass. 783, 785 (1977); Commonwealth v. Swanson, 56 Mass. App. Ct. 459, 462 (2002).

probable cause requirements of the Federal and State constitutions.[8]  See Commonwealth v. Snell, 428 Mass. 766, 774-775, 776 n.7, cert. denied, 527 U.S. 1010 (1999); Commonwealth v. Duncan, 467 Mass. 746, 749-750, cert. denied, 135 S. Ct. 224 (2014); Commonwealth v. Cantelli, 83 Mass. App. Ct. 156, 165 (2013).  "This exception 'permits the police to enter a home without a warrant when they have an objectively reasonable basis to believe that there may be someone inside who is injured or in imminent danger of physical harm.'"  Duncan, 467 Mass. at 749-750, quoting from Commonwealth v. Peters, 453 Mass. 818, 819 (2009).  "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."[9]  Snell, 428 Mass. at 774, quoting from Commonwealth v. Bates, 28 Mass. App. Ct. 217, 219 (1990).  See Brigham City v. Stuart, 547 U.S. 398, 403 (2006).

---

[8] The emergency aid exception, which requires no probable cause, is thus distinct from the "exigent circumstances" exception, which permits a warrantless search where probable cause exists, but circumstances such as the imminent loss of evidence make obtaining a warrant impracticable.  See Commonwealth v. Washington, 449 Mass. 476, 480 (2007); Duncan, 467 Mass. at 750.

[9] As Duncan indicates, the emergency aid exception may be based on the need to find and assist a person who has already been harmed, the need to prevent future harm, or both.  In the context of prevention of future harm, the label "pure emergency" has sometimes been applied.  See Duncan, 467 Mass. at 749; Cantelli, 83 Mass. App. Ct. at 158; Cypher, Criminal Practice & Procedure § 5.156 (4th ed. 2014); Grasso & McEvoy, Suppression Matters Under Massachusetts Law §§ 4-2[f][1], 14-1[c][3][vi] (2017 ed.).

"The reason is plain:  'People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process.'"  Commonwealth v. Ringgard, 71 Mass. App. Ct. 197, 201 (2008), quoting from Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir.), cert. denied, 375 U.S. 860 (1963).

In such cases, probable cause is not required, "because the purpose of police entry is not to investigate criminal activity. . . .  Instead, a warrantless entry 'must meet two strict requirements.  First, there must be objectively reasonable grounds to believe that an emergency exists. . . .  Second, the conduct of the police following the entry must be reasonable under the circumstances . . . .'"  Duncan, 467 Mass. at 750, quoting from Peters, 453 Mass. at 823.  The burden of showing reasonableness is on the Commonwealth.  Cantelli, 83 Mass. App. Ct. at 167.

"The injury sought to be avoided must be immediate and serious, and the mere existence of a potentially harmful circumstance is not sufficient."  Commonwealth v. Kirschner, 67 Mass. App. Ct. 836, 841-842 (2006).  But neither is "ironclad proof of 'a likely serious, life-threatening' injury" required.  Commonwealth v. Entwistle, 463 Mass. 205, 214 (2012), cert. denied, 568 U.S. 1129 (2013), quoting from Michigan v. Fisher, 558 U.S. 45, 49 (2009).  "It suffices that there are

objectively reasonable grounds to believe that emergency aid might be needed."  Entwistle, supra.

"[W]hether an [emergency] existed, and whether the response of the police was reasonable and therefore lawful, are matters to be evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis."  Commonwealth v. Young, 382 Mass. 448, 456 (1981). What matters are the objective circumstances known to police officers; their subjective motives are irrelevant.  Entwistle, 463 Mass. at 214.

Thus, in Snell, the court upheld a warrantless entry into the defendant's house because "[t]here existed objectively reasonable grounds to believe that [the defendant's wife] might be injured or dead inside," presenting a domestic violence situation, "which often calls for rapid police response designed to prevent further injury to a victim, to see whether a threat against a victim has been carried out, or to ascertain whether some other grave misfortune has befallen a victim."  428 Mass. at 775.  And in Cantelli, we upheld a warrantless police entry into the defendant's apartment to allow a technician to turn off the gas supply to the defendant's stove, where his prior erratic conduct in allowing "explosive levels" of gas to fill his apartment, and in refusing entry to the technician, presented

"an emergency of sufficient proportions . . . to render a warrantless entry reasonable."  83 Mass. App. Ct. at 165-166.

The emergency aid exception also applies to searches within lawfully-entered homes.  In Commonwealth v. Samuel, 80 Mass. App. Ct. 560 (2011), the police, after entering an apartment with a resident's consent, searched under a pillow where they reasonably believed the defendant had hidden a loaded firearm. The defendant had earlier told others that he would use the firearm in a killing for hire.  We upheld the search under the emergency aid exception.  Id. at 562-564.

Other decisions have applied the exception to uphold warrantless searches of places other than homes, in order to find and assist a victim of serious physical harm or to prevent such harm from occurring.  See Commonwealth v. Marchione, 384 Mass. 8, 11-12 (1981) (search of commercial premises where there was reason to believe explosive liquid was stored in partially-open containers near homemade incendiary device); Commonwealth v. Ortiz, 435 Mass. 569, 572-573 (2002) (search of fruit store to find missing person who police reasonably believed was inside and injured or dead); Commonwealth v. DiMarzio, 52 Mass. App. Ct. 746, 747-750 (2001), S.C., 436 Mass. 1012 (2002) (police entry into warehouse office to find angry, intoxicated man who had just threatened to come to couple's house with shotgun); Commonwealth v. McCarthy, 71 Mass. App. Ct. 591, 594-

595 (2008) (search of handbag of woman who collapsed in public of apparent drug overdose, to find type of drug she might have ingested in order to assist medical personnel in treating her).

We mention two other cases that illustrate the reach of the emergency aid exception. In Duncan, the court extended the exception to protect nonhuman animal life. 467 Mass. at 753. And in Commonwealth v. Hurd, 29 Mass. App. Ct. 929 (1990), we applied the exception to uphold police officers' stop of a motor vehicle with New Hampshire license plates approaching the entrance to a highway, based on an anonymous tip that the driver was intoxicated and had three small children with him. "The police, having reasonable grounds to believe that an exigency existed, acted appropriately in stopping the automobile to see if, in fact, the driver was intoxicated. Such action was reasonably necessary to protect the children and the public from 'unnecessary exposure to risk of injury.'" Id. at 930-931, quoting from Commonwealth v. Fitzgibbons, 23 Mass. App. Ct. 301, 306 (1986).

b. Application of emergency aid exception. The defendant does not contend that the emergency aid exception could never justify warrantless real-time CSLI tracking; rather, she argues only that the exception's requirements were not met here. Therefore, assuming without deciding that this was a search, we will also assume without deciding that it would have been

permissible if the exception's requirements were met.[10] Accordingly, we examine whether the Commonwealth has met its "burden of showing that authorities had a reasonable ground to believe that an emergency existed and that the actions of the police were reasonable in the circumstances." Commonwealth v. Knowles, 451 Mass. 91, 96 (2008).

We have no difficulty concluding that these standards were met here. The police overheard a phone call in which an angry, upset individual said she was "going to get the . . . gun" and was "about to go shoot up [someone] right now . . . . I'm going to his, I'm going right there, right now." The police identified the person making the threat as the defendant and thus inferred that she was likely talking about shooting Dorsey. The judge, after listening to a recording of the call, found that "the police were reasonable in having grave concerns about the defendant imminently causing serious bodily harm," and we see no basis for rejecting that finding. See DiMarzio, 52 Mass. App. Ct. at 747-751 (emergency aid exception applied where

---

[10] Several courts have concluded that the emergency aid exception justified real-time CSLI tracking in particular circumstances. See United States v. Gilliam, No. 11 Crim. 1083 (S.D.N.Y. Sept. 12, 2012); United States v. Takai, 943 F. Supp. 2d 1315, 1323 (D. Utah 2013); United States v. Caraballo, 963 F. Supp. 2d 341, 363–364 (D. Vt. 2013), aff'd, 831 F.3d 95 (2d Cir. 2016), cert. denied, 137 S. Ct. 654 (2017). See also Carpenter v. United States, 138 S. Ct. at 2223 (although government generally needs warrant to access CSLI, there may be exceptions for exigencies such as "the need to . . . protect individuals who are threatened with imminent harm").

police reasonably believed that angry, intoxicated person had just threatened to come to couple's house with shotgun); Samuel, 80 Mass. App. Ct. at 563-564 (exception applied where police reasonably believed that person had concealed loaded gun under pillow and announced that he had been hired to kill someone). Although the defendant here argues that the police had no basis other than her own statement for believing she had access to a firearm, such a statement was found sufficient in DiMarzio, 52 Mass. App. Ct. at 748-749, and it was sufficient here.

What police did not know here, at the time of the call, was the whereabouts of the defendant. In the circumstances, it was objectively reasonable for the police to request real-time CSLI, in order to determine the defendant's current location and the direction in which she was moving, and thus to find and intercept her before she could shoot Dorsey.

The defendant points out that when AT&T, in response to the "exigency request," sent the police her subscriber information as well her real-time CSLI information, the police learned her home address in Braintree. She argues that at that point, the police could have asked their counterparts in Braintree to look for her at her home, instead of tracking her using CSLI. But this ignores, among other factors, that the police had no information suggesting that she was actually at her home or would still be there when police arrived. Indeed, the police

had just heard her say that she was "going to get the . . . gun" and "going to his . . . going right there, right now" to shoot the intended victim, thus indicating that she was leaving wherever she was and going to wherever she believed Dorsey was. The defendant's second-guessing approach contravenes the principle that the reasonableness of the police response is "to be evaluated in relation to the scene as it could appear to the officers at the time . . . ." Young, 382 Mass. at 456.

The same is true of the defendant's argument that the police, once they formed a belief that her target was Dorsey and that he might be at his girl friend's address, could simply have gone to that address instead of tracking her using CSLI. Even assuming (although the record does not show it) that the police formed this belief about Dorsey's whereabouts before they obtained any CSLI, their belief was merely that Dorsey "may have been" at that address. It was reasonable for the police to believe that a more direct and sure way of preventing the defendant from shooting Dorsey was to find and intercept the defendant herself. See DiMarzio, 52 Mass. App. Ct. at 748 (where defendant left couple's house but threatened to return with a shotgun, "[i]t was reasonable for the police to go looking for the defendant to gather further information").

The defendant makes no other argument that the police lacked reasonable ground to believe that an emergency existed or

that their actions were unreasonable in the circumstances. The police tracked her location using CSLI for a brief period, apparently not exceeding two hours, and intercepted her immediately after hearing her say, in a second phone call, that she was "sitting right in front of [the girl friend's] house," and was going to "shoot him and his bitch in the face." We conclude that the police use of the CSLI voluntarily provided by AT&T, assuming without deciding that it was a search that could in principle be justified by the emergency aid exception, was justified on these facts.

2. Search of motor vehicle. The judge upheld the search of the defendant's motor vehicle based on the automobile exception to the warrant requirement.[11] That exception "applies to situations where the police have probable cause to believe that a motor vehicle parked in a public place and apparently capable of being moved contains contraband or evidence of a crime." Commonwealth v. Dame, 473 Mass. 524, 536 (quotation omitted), cert. denied, 137 S. Ct. 132 (2016). The exception extends to a vehicle's trunk, if the item(s) sought may reasonably be thought to be there. See Commonwealth v. Garden, 451 Mass. 43, 51-52 (2008); Commonwealth v. Hernandez, 473 Mass.

---

[11] The judge did not address whether the search was valid as an inventory search incident to an impoundment of the vehicle. We therefore need not address the defendant's argument on appeal that the police lacked a valid basis for impoundment. See Commonwealth v. Gouse, 461 Mass. 787, 792 n.7 (2012).

379, 383-384 (2015).  The judge here concluded that police had probable cause to believe that "the defendant's car contained a loaded firearm and that she intended to use it."

On appeal the defendant argues that the automobile exception was inapplicable only because the police lacked probable cause to search the trunk for a gun.[12]  She contends that, although her statements to Coke gave reason to "suspect that she was carrying a gun, . . . once the stun gun was located in [her] purse, the force of those statements as evidence that she had some other type of gun was greatly diluted" and fell below the level of probable cause.

Even assuming that the stun gun was found first (an issue on which the evidence was unclear and the judge made no finding), we disagree.  The defendant stated in the first call that she was going to "get the fucking gun" and "shoot up" the intended victim.  She stated in the second call, from outside

_____

[12] Because the defendant does not contend otherwise, we assume that the search was lawful if, as the judge concluded, there was probable cause to believe that the defendant intended to use the gun to shoot someone, i.e., that she was about to commit a crime.  The United States Supreme Court "repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).  The defendant does not argue that art. 14 imposes any stricter standard in this regard.  See Commonwealth v. Fulgiam, 477 Mass. 20, 33, cert. denied, 138 S. Ct. 330 (2017).

his girl friend's residence, that she was going to "shoot him and his bitch in the face," that she was prepared to "pistol whip" him, and that if he sent anyone to attack her, it would be a "firefight."  These statements furnished ample objective grounds -- in no way weakened by the discovery of a stun gun in her handbag -- to believe that the defendant possessed and was prepared to use a loaded firearm, and that it was somewhere in the motor vehicle.

<u>Order denying motions to suppress affirmed</u>.